UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PABLO B. MATIAS,

              Petitioner,

    v.

CONNIE GIPSON,

              Respondent.

Case No.  14-cv-00526-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

    Pablo Matias, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254.  The Court ordered respondent to show cause why the writ should not be granted.  Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court.  Matias filed a traverse.  The petition is denied.

## BACKGROUND

    A jury convicted Matias of four counts of aggravated lewd conduct with a minor under the age of fourteen and also found that he committed the offenses against two victims.  Clerk's Transcript ("CT") at 313, 320, 327, 334, 341.  He was sentenced to an indeterminate term of 60 years to life in prison.  *Id*. at 358-60.  The California Court of Appeal affirmed the conviction.  *People v. Bedolla-Matias*, No. H035711, 2012 WL 1490489, at *1 (Cal. Ct. App. April 27, 2012).  The California Supreme Court denied Matias' petition for review.  Answer, Ex. 9.  He also filed a state habeas petition that was denied.  Answer, Exs. 10-11.

    The California Court of Appeal summarized the facts of the crime as follows:

        A. and her cousin L., the victims, were seven years old when they testified.  FN2  They lived in the same house with several relatives, including J., who is A.'s sister and L.'s cousin.  At the time the offenses occurred, defendant also lived at the house.

FN2. In addition to their live testimony, A.'s and L.'s preliminary hearing testimony and evidence of their interviews with police officers were also admitted at trial.

A. testified that defendant touched her private parts on more than one occasion and told her not to tell her mother. She was scared. One time when she was in the kitchen, he touched her crotch over her shorts. On another occasion, she was eating soup in the kitchen, and defendant "cupp[ed]" her crotch with his hand. She was afraid and told him to stop, but he did not. She screamed for L. to come in so that he would stop. She said he would stop touching her whenever someone else entered the room.

A. testified that defendant never touched her skin, penetrated her with his finger, or kissed her on the mouth or breasts. Although she initially said that she never told anyone that he had kissed her, she corrected herself and said that she told J., who then reported it to A.'s mother. She said she once tried to tell her aunt, but she was watching TV and did not pay any attention to her.

At the preliminary hearing, A. testified that defendant touched her private parts around five times directly on her skin. He also kissed her on the neck. She said he touched her when she was in the kitchen. She said that he did not penetrate her with his finger. She asked him to stop, but he would not and told her not to tell her mother. She also said she was afraid of him. She said that there were times when defendant was molesting her that she wanted to scream, but she denied that he ever put his hand over her mouth and denied telling anyone that he had. She said she told her sister J. and her cousin L. about what defendant was doing.

L. testified that defendant touched her private parts directly on her skin under her underwear more than once, and she did not like it. She told him to stop, but he would not do so and told her not to tell anyone. She further testified that on one occasion, defendant was outside her bedroom window at night and asked her to touch his private part. She did not do so and could not remember if she saw it. On another occasion, she went into the living room, and defendant offered her two dollars, but she refused. She could not recall if he tried to touch her.

At the preliminary hearing, L. testified that defendant touched her crotch area at least five and maybe nine times. She said she was scared and told him to stop but he would not. She said he also touched her neck with his hand. She said she told her aunt and uncle.

J. was 14 when she testified. She said that on April 7, 2009, a male cousin told her that defendant had tried to grab A. When J. asked A., A. was upset and afraid to talk about it because defendant had told her not to tell anyone. She said that defendant once gave her a dollar not to tell anyone. Nevertheless, A. disclosed that defendant had touched her and L. in places she did not like. He touched her private part and put his finger inside which hurt and made her private part "rosada," which J. explained, meant red and raw. He

2

also kissed her neck. A. told J. not to tell their mother, but J. did, and the police were called.

On April 7, 2009, Officers Yvonne Dela Cruz and Jose Uribe of the San Jose Police Department visited the victims' home. Officers De La Cruz interviewed A.; Officer Uribe interviewed L.  FN3

> FN3.  Both officers recorded their interviews. Officer De La Cruz's recording was played for the jury.   Officer Uribe could not find the recording of his interview.

At that time, A. said that defendant had touched her private part outside her clothing four times and sometimes kissed her on the neck and mouth.  FN4  Defendant told her not to tell her mother.  L. said that one time, defendant was outside her window urinating, opened the window, called her, touched her breasts and crotch, and pulled her head to make her look at his penis.  On another occasion, he kissed her neck and gave her a dollar not to tell anyone.

> FN4.   At the preliminary hearing, A. said that defendant never kissed her mouth.

Officer Patricia Jaime with the Sexual Assault Unit of the San Jose Police Department conducted follow-up, recorded interviews with A. and L. on April 9, 2009, which were played for the jury.

A. said that defendant touched her private parts on four different occasions and also kissed her on the mouth and neck.  The last time it happened, she asked him to stop but he kept on kissing her, and when she tried to call out to her aunt, he covered her mouth with his hand.   When A.'s aunt came into the room, defendant hid in the closet.  FN5

> FN5. At the preliminary hearing, A. said the defendant never covered her mouth with his hand, and she denied telling Officer Jaime that he had.

A. said that on another occasion, his touching caused her to bleed from her "pee-pee" because he "squished" her.  She explained that defendant pulled her underwear aside, put his hand there, and also touched her there with his fingernails, which hurt.  This caused her to bleed and made her sad and worried.  She said he penetrated her three times.  She also said he tried to kiss her vagina under clothing about five times.  FN6  She recounted how once he touched her in the kitchen when she was eating soup.  Another time, he took off her shirt and tried to kiss her breasts, but she pushed him away.

> FN6. At the preliminary hearing, A. denied that defendant kissed her vagina.

L. said that defendant was always grabbing her and would kiss her. She said he touched her under her underwear five to 10 times and penetrated her vagina with his finger, which felt bad and hurt.  He told her he would continue to do this if she told anyone about it. He once grabbed her hand and forced her to touch his penis under his underwear.  He also kissed her on the neck.

Mary Ritter, a physician's assistant at the Center for Child Protection at the Santa Clara Valley Medical Center, examined A. and L.  A. told her that there had been hand and oral vaginal contact but no bleeding.  A. also said that defendant had kissed her mouth, and she had seen his penis.  FN7  Ms. Ritter found no evidence of penetrating trauma and a normal looking hymen, but she noticed some redness in A.'s genital area, which, however, could have had a variety of causes.

> FN7. At the preliminary hearing, A. said she never saw defendant's penis and denied saying that she had.

L. told Ms. Ritter that defendant had touched her vagina with his hand, but she denied any pain.  She also said she had seen defendant's penis and touched it.  FN8  Ms. Ritter found no evidence of penetrating trauma.  She observed a mound on L.'s hymen that could be a benign, normal finding or the remnant of a prior sexual assault.  However, Ms. Ritter could not determine the actual cause or whether there had been an assault.

> FN8. At the preliminary hearing, L. denied telling Ms. Ritter about seeing defendant's penis.

Dr. David Kerns, an expert in the area of child sexual abuse, reviewed Ms. Ritter's findings and agreed with them.  He said that the majority of prepubescent girls who have been sexually abused have "normal" examination results.

Carl Lewis testified as an expert on CSAAS.  He explained that the way in which a child discloses abuse or behaves when being abused can conflict with common, preconceived notions of how a child might or should react.  CSAAS describes a variety of factors that may exist when a disclosure is made.  It can provide background information and explains that there is no single thing to look for in determining whether a child is being or has been abused.  However, CSAAS is not a science or a measure of whether a child is telling the truth about being abused.

That said, Mr. Lewis described five categories of CSAAS, that may or may not be present in a case.  The first category is secrecy.  An abuser often takes advantage of the fact that abusive conduct usually occurs in a private setting and enforces this secrecy by telling the child not to say anything and perhaps threatening consequences.  The second category is helplessness that arises from the child's dependence on adults.  As a result, disclosure tends to involve a process rather than a one-time report.  Helplessness can be reinforced when there is an inadequate response to an attempt to disclose.  The third category is entrapment and accommodation.  A child may feel trapped by circumstances and accommodate the abuse by dissociating or acting as if nothing were wrong.  The fourth category is delayed, conflicted, or unconvincing disclosure.  A child often delays reporting abuse, and most times it is not disclosed until some time after it has occurred.  Conflicted disclosure describes the process a child goes through in deciding whether to report abuse and also the fact that during that process, the child may say different things at different times about what happened.  Unconvincing

4

1   disclosure describes the way in which a child may disclose the abuse
2   in a way that makes it seem unbelievable.  The fifth category is
    retraction.  Once a child reports abuse, he or she receives a lot of
3   attention that can disrupt normal life; and often, the child will
    minimize or retract what he or she had disclosed so that life can
    return to normal.

4   B.  Defense Case
5   Defendant presented no evidence of his own but relied on cross-
    examination to undermine the credibility and reliability of A.'s and
6   L.'s testimony and statements to others and argue that the
    prosecution had not met its burden to prove the charges beyond a
    reasonable doubt.

7   *Matias*, 2012 WL 1490489, at *1-4.

8                              **STANDARD OF REVIEW**

9           A district court may not grant a petition challenging a state conviction or sentence on the

10  basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

11  of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

12  application of, clearly established Federal law, as determined by the Supreme Court of the United

13  States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

14  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first

15  prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*,

16  529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

17  determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

18          A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

19  clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by

20  [the Supreme] Court on a question of law or if the state court decides a case differently than [the

21  Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

22  A state court decision is an "unreasonable application of" Supreme Court authority, falling under

23  the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the

24  Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

25  case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that

26  court concludes in its independent judgment that the relevant state-court decision applied clearly

27  established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be

28

1    "objectively unreasonable" to support granting the writ.  *Id.* at 409.

2         Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

3    not be overturned on factual grounds unless objectively unreasonable in light of the evidence

4    presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at 340; *see also Torres v.*

5    *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, in conducting its analysis, the federal

6    court must presume the correctness of the state court's factual findings, and the petitioner bears the

7    burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

8         The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

9    state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

10   1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court to

11   consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Nunnemaker* at

12   801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  The standard of review

13   under AEDPA is somewhat different where the state court gives no reasoned explanation of its

14   decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.

15   In such a case, a review of the record is the only means of deciding whether the state court's

16   decision was objectively reasonable.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003);

17   *Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir. 2000).  When confronted with such a decision,

18   as with the first three claims in this petition, a federal court should conduct an independent review

19   of the record to determine whether the state court's decision was an objectively unreasonable

20   application of clearly established federal law.  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

21                                   **DISCUSSION**

22         As grounds for federal habeas relief, Matias asserts that: (1) his sentence was improper; (2)

23   trial counsel was ineffective for failing to object to the sentencing and for failing to properly

24   investigate the case; (3) the trial court instead of the jury made certain findings that increased the

25   sentence; (4) the trial court issued an improper jury instruction regarding propensity evidence; (5)

26   trial counsel was ineffective for failing to object to the propensity jury instruction; (6) the trial

27   court improperly admitted evidence; (7) the trial court improperly admitted expert testimony of

28   child sexual abuse accommodation syndrome (CSAAS); (8) there was insufficient evidence; and

United States District Court
Northern District of California

6

1    (9) the trial court issued an improper jury instruction regarding duress.

2    **I.**        **IMPROPER SENTENCING**

3    Matias first argues that his due process rights were violated by the trial court, which

4    incorrectly applied state law and imposed multiple punishments for the same criminal conduct.

5            **Legal Standard**

6    State sentencing courts must be accorded wide latitude in their decisions as to punishment.

7    *See Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987).  Generally, therefore, a federal court may

8    not review a state sentence that is within statutory limits.  *See id*.  However, the constitutional

9    guarantee of due process is fully applicable at sentencing.  *See Gardner v. Florida*, 430 U.S. 349,

10   358 (1977).  A federal court may vacate a state sentence imposed in violation of due process; for

11   example, if a state trial judge (1) imposed a sentence in excess of state law, *see Walker*, 850 F.2d

12   at 476; *see also Marzano v. Kincheloe*, 915 F.2d 549, 552 (9th Cir. 1990) (plea of guilty does not

13   permit state to impose sentence in excess of state law despite agreement of defendant to sentence),

14   or (2) enhanced a sentence based on materially false or unreliable information or based on a

15   conviction infected by constitutional error, *see United States v. Hanna*, 49 F.3d 572, 577 (9th Cir.

16   1995); *Walker*, 850 F.2d at 477.

17   Federal courts must defer to the state courts' interpretation of state sentencing laws.  *See*

18   *Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993).  "Absent a showing of fundamental

19   unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas

20   relief."  *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *see, e.g.*, *Miller v. Vasquez*, 868

21   F.2d 1116, 1118-19 (9th Cir. 1989) (whether assault with deadly weapon qualifies as "serious

22   felony" under California's sentence enhancement provisions, Cal. Penal Code §§ 667(a) and

23   1192.7(c)(23), is question of state sentencing law and does not state constitutional claim).

24           **Discussion**

25   Matias was sentenced to 60 years to life pursuant to California Penal Law section 667.6(d)

26   because the offenses were committed against separate victims on separate occasions.  CT at 313,

27

28

United States District Court
Northern District of California

320, 327, 334, 341, 358-60; Reporter's Transcript ("RT") at 527. [1]  Matias argues that the sentence violated California Penal Law section 654(a), which states:

> An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

*See id.*

This claim and claims two and three were all denied by the California Supreme Court without a reasoned decision in a state habeas petition.  Therefore, the Court has conducted an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.

A state prisoner is entitled to federal habeas corpus relief only if he is held in custody in violation of the Constitution, laws, or treaties of the United States.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Matias is not entitled to relief for an error under state law.  Nor has he shown that the state court's sentence was fundamentally unfair, and a review of the record indicates that the sentence properly complied with section 667.6(d) and did not run afoul of section 654.  Matias was sentenced for committing multiple acts against multiple victims based on the findings of the jury.

Even if the Court assumes that the sentence involved section 654 and that the state court misapplied that section, the Ninth Circuit has held that the resulting error does not give rise to a cognizable federal claim.  *See Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) (claim premised solely on misapplication of California Penal Code section 654 is not cognizable of federal habeas review).  The claim is denied.

---

[1] Section  667.6(d) provides in part: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."

United States District Court
Northern District of California

United States District Court
Northern District of California

1

## II.     INEFFECTIVE ASSISTANCE OF COUNSEL-SENTENCING

Matias argues that counsel was ineffective for failing to object to the alleged improper sentence, for failing to adequately investigate the case, and for not forcing the prosecutor to provide the exact dates for each assault in order to obtain alibi witnesses.

**Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id*.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

**Discussion**

Matias first argues that counsel was ineffective for failing to object to his sentencing.  But because he underlying sentencing claim fails on the merits, Matias could not have been prejudiced by counsel's failure to object.  Nor was counsel's failure to object deficient performance because any objection likely would have failed.   Trial counsel cannot have been ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

Matias has not shown that it was unreasonable for the state court to deny the claim that counsel was ineffective for failing to properly investigate the case and by not forcing the prosecutor to provide exact dates of each assault to allow for alibi witnesses.  A defense attorney has a general duty to make reasonable investigations and reasonable decisions about

9

United States District Court
Northern District of California

1 | investigations. *See Strickland*, 466 U.S. at 691; *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014)

2 | (per curiam). *Strickland* directs that "a particular decision not to investigate must be directly

3 | assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

4 | counsel's judgments." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*,

5 | 466 U.S. at 691). Counsel need not pursue an investigation that would be fruitless or might be

6 | harmful to the defense. *Harrington v. Richter*, 562 U.S. 86, 108 (2011). Assuming counsel

7 | should have found and presented additional evidence, a state court's rejection of a claim of

8 | ineffective assistance based on counsel's failure to pursue further investigation is reasonable if the

9 | additional evidence would not likely have caused the jury to reach a different verdict. *See*

10 | *Samayoa v. Ayers*, 649 F.3d 919, 929-30 (9th Cir. 2011).

11 |      Matias has not demonstrated deficient performance or prejudice. Matias does not describe

12 | what counsel should have investigated and what information favorable to the defense would have

13 | been uncovered with that investigation. Nor has he shown that counsel could have obtained the

14 | exact dates for each incident. Based on the facts of this case, it is not likely that the young victims

15 | could have provided exact dates for each incident. Furthermore, there is no United States

16 | Supreme Court precedent that a charging document alleging only an approximate date of an

17 | offense violates due process. Federal courts have rejected habeas claims challenging the lack of

18 | specific dates in an information, especially when the charges involved sexual abuse of a minor.

19 | *See Brodit v. Cambra*, 350 F.3d 985, 988-89 (9th Cir. 2003) (rejecting constitutional challenge to

20 | California statute permitting state to charge defendant with child molestation occurring during a

21 | date range rather than on specified dates). Even had counsel requested the exact dates, Matias has

22 | not shown that the prosecutor could have provided the information.

23 |      Matias has not provided any names or information regarding possible alibi witnesses. A

24 | defendant's mere speculation that a witness might have given helpful information if interviewed is

25 | not enough to establish ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th

26 | Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). Matias has failed to show deficient performance

27 | or that he was prejudiced as a result. Because he has not shown that the state court denial of this

28 | claim was an unreasonable application of Supreme Court authority, the claim is denied.

III.     **RIGHT TO A JURY TRIAL**

Matias contends that the trial court, rather than the jury, made findings that there were separate criminal acts against two victims that increased his sentence in violation of the Sixth Amendment.

**Legal Standard**

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 488-90 (2000) (finding unconstitutional state law that permitted judge to impose extended term of imprisonment if he found by a preponderance of the evidence that the crime committed was a "hate crime"). The "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004).

In *Harris v. United States*, 536 U.S. 545 (2002), the Supreme Court held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment. *Harris* drew a distinction between facts that increase the statutory maximum and facts that increase only the mandatory minimum. 536 U.S. at 554-68 (upholding *McMillan v. Pennsylvania*, 477 U.S. 79 (1986)). But in *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), the Court concluded that this distinction is inconsistent with *Apprendi* and the original meaning of the Sixth Amendment, and overruled *Harris*. The Court made clear that:

> Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.

*Alleyne*, 133 S. Ct. at 2155 (citations omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**Discussion**

Matias argues that he is entitled to habeas relief because the trial court found that there were separate underlying incidents of lewd conduct against two victims and that this finding increased his sentence contrary to *Alleyne*.  In *Alleyne*, the defendant was subject to three possible mandatory minimum terms of imprisonment - five, seven or ten years - for using or carrying a firearm during the commission of a crime.  Five years was the presumptive floor, while a defendant found to have brandished the firearm faced a mandatory minimum of seven years, and a defendant found to have discharged the firearm faced a mandatory minimum of ten years.  *Alleyne*, 133 S. Ct. at 2155-56.  The judge sentenced Alleyne to seven years, finding that he had brandished the firearm.  The Supreme Court reversed, concluding Alleyne's sentence had been increased over the statutory minimum of five years using facts found by a judge (that the firearm was brandished) and not by a jury beyond a reasonable doubt in violation of the Sixth Amendment.  *Id*. at 2158.

Matias is not entitled to habeas relief because the holding in *Alleyne* is not applicable to this case.  The jury found Matias guilty of four separate counts and also found that in each count there was more than one victim.  CT at 313, 320, 327, 334, 341.  Each count provided for 15 years to life in prison and for the terms to be consecutive.  CT at 358-60; RT at 526-27.  It was not the trial court that found these elements to impose the sentence; rather, the jury made the findings for each of the four counts and the California Penal Code provided for the sentence.  California Penal Code section 667.6(d) provides in part: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."

The trial court did not make any determination that increased the penalty for the crimes.  To the extent that Matias argues the consecutive sentences were improper, he is not entitled to relief because this case is similar to *Oregon v. Ice*, 555 U.S. 160 (2009).  The defendant in *Ice* was sentenced to consecutive sentences after the sentencing judge found, pursuant to Oregon law, that the two burglaries of which Ice was convicted were "separate incidents," and that each sexual offense Ice committed indicated a "'willingness to commit more than one . . . offense' during each

12

criminal episode, and his conduct 'caused or created a risk of causing greater, qualitatively

different loss, injury or harm to the victim.'" *Ice*, 555 U.S. at 165–66.  Upholding the sentence,

the Supreme Court noted that historically, "the jury played no role in the decision to impose

sentences consecutively or concurrently.  Rather, the choice rested exclusively with the judge."

*Ice*, 555 U.S. at 168.  The Court concluded that sentencing a defendant to consecutive rather than

concurrent sentences based on judge-found facts did not offend the Sixth Amendment.  *Id*. at 171-

72.

The state court decision denying this claim was not an unreasonable application of

Supreme Court authority.  Furthermore, any error was harmless under *Brecht v. Abrahamson*, 507

U.S. 619 (1993), due to the evidence presented at trial that described multiple sexual assaults

against two victims on several occasions.

**IV.      PROPENSITY JURY INSTRUCTION**

Matias argues that the trial court violated his due process rights by issuing to the jury a

propensity instruction which permitted the jury to consider evidence of a charged offense as

propensity evidence for the other charged offenses.

**Background**

Over trial counsel's objection the trial court issued a modified version of CALCRIM No.

1191 which stated:

> The People presented evidence that the defendant committed the
> crimes of lewd or lascivious act on a child by force or fear against
> [A.] and [L.].  These crimes are defined for you in these instructions.
> [¶]  If you decide the defendant committed a charged offense, you
> may but are not required to conclude from that evidence that the
> defendant was disposed or inclined to have the requisite specific
> intent for other charged crimes, and based on that decision also
> conclude that the defendant was likely to and did have the requisite
> specific intent for other charged offenses.  If you conclude that the
> defendant committed the charged offense, that conclusion is only
> one factor to consider, along with all the other evidence.  It is not
> sufficient by itself to prove that the defendant is guilty of other
> charged offenses.  The People must still prove each element of every
> charge beyond a reasonable doubt.  Do not consider this evidence
> for any other purpose except for the limited purpose of determining
> the specific intent of the defendant in certain charged offenses.

CT at 260, 299; RT at 489-90.

13

United States District Court
Northern District of California

**Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction. *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 71-72). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id*. at 72. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle* at 75 n.5. Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006).

**Discussion**

The California Court of Appeal discussed at length the relevant state law and denied this claim. *Matias*, 2012 WL 1490489, at *10-16. Three months after the California Court of Appeal issued its opinion, the California Supreme Court issued *People v. Villatoro*, 54 Cal. 4th 1152 (2012).[2] In *Villatoro*, the court upheld the use of a similar modified version of CALCRIM No. 1191 to permit the jury to use evidence of a defendant's other charged offenses to draw an inference of a defendant's propensity to commit the sexual offenses. *Id*. at 1164-65. To the extent Matias challenges the state court's interpretation of state law he is not entitled to relief. *See*

---

[2] The California Supreme Court denied Matias' petition for review raising this claim after *Villatoro* was decided. Answer, Exh. 9

*Estelle*, 502 U.S. at 71-72.

No Supreme Court case holds that the admission of propensity evidence violates due process, and Matias has not shown that the denial of this claim was unreasonable.  In *Schultz v. Tilton*, 659 F.3d 941 (9th Cir. 2011) the Ninth Circuit analyzed an unmodified version of CALCRIM 1191 regarding uncharged sexual misconduct, as opposed to this case which concerned charged sexual misconduct.  The Ninth Circuit held that an instruction concerning a defendant's uncharged sexual misconduct "in no way suggests that a jury could reasonably convict a defendant for charged offenses based merely on a preponderance of the evidence."  659 f.3d at 945.  The court found that the instruction "was unambiguous and made clear that [ a defendant] could be convicted only if the evidence as a whole 'proved [him] guilty beyond a reasonable doubt of the charged crime.'"  *Id*.  The Ninth Circuit's ruling in *Schultz* tends to show that the instruction given in this case was also proper.

Matias has also not shown that this jury instruction so infected the entire trial that the resulting conviction violated due process.  The jury was properly instructed on the burden of proof in the other aspects of this case and it is clear that the jury credited the testimony of the victims.  Matias has failed to meet his burden in demonstrating that the state court opinion was objectively unreasonable, and this claim is denied.

**V.      INEFFECTIVE ASSISTANCE OF COUNSEL-JURY INSTRUCTION**

Matias also argues that counsel was ineffective for failing to object to the propensity jury instruction (see claim above) on the ground that the prosecution did not give the requisite notice under state law.

**Discussion**

Matias argues that the prosecutor failed to comply with California Evidence Code section 1108, which requires the prosecutor to disclose propensity evidence at least thirty days before trial.  *Matias*, 2012 WL 1490489, at *15.  He alleges that counsel was ineffective for failing to object to the lack of notice.  The California Court of Appeal denied this claim:

> Here, the record does not reveal counsel's reasons, and we do not
> find that counsel's omission was unreasonable as a matter of law.

"Counsel does not render ineffective assistance by failing to make motion or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)  Here, counsel could have considered an objection unnecessary or pointless because he had notice before trial of the evidence from which jurors would be allowed to draw an inference of propensity under the [jury] instruction.  Counsel could have reasoned that he had no more evidence to rebut that inference than he had to offer in defense of the charges and thus concluded that the basic defense-i.e., that A. and L. were unreliable and thus the prosecution could not prove any act beyond a reasonable doubt-would also allow him to urge jurors not to draw a propensity inference.

Moreover, on the record before us, defendant cannot establish prejudice.  Again, defendant had notice of the evidence from which the jury might infer a propensity.  When the [jury] instruction was first mentioned, counsel did not seek to reopen the case to present evidence to rebut any potential inference.  And the record does not suggest that defendant had or could have had any evidence.  As noted, if he had such evidence, he could have offered it instead of introducing no evidence to support his defense.  Accordingly, we do not find a reasonable probability that the court would have declined to give a [jury] instruction had counsel raised the notice objection.  More fundamentally, because the [jury] instruction permitted jurors to draw only an inference that defendant had a propensity to harbor the specific intent necessary to establish unlawful lewd conduct and because, as defendant concedes, his intent was not subject to reasonable dispute if the jury found that he committed an alleged lewd act, we do not find a reasonable probability that defendant would have obtained a more favorable result had the [jury] instruction not been given.

*Matias*, 2012 WL 1490489, at *16.

Matias has not shown that the state court opinion was an unreasonable application of *Strickland*.  It was not unreasonable for the California Court of Appeal to conclude that counsel was not deficient because any objection would have been futile.  The purpose of pretrial notice is to ensure that "the defendant will not be surprised or unprepared to rebut the proposed evidence." *People v. Falsetta*, 21 Cal. 4th 903, 916 (1999).  In this case the propensity evidence did not involve any uncharged behavior.  The evidence at issue was the charged counts and the evidence of lewd conduct against A. and L.  Matias and his counsel had long known what evidence would be presented at trial and the identity of the victims.

Assuming that counsel was deficient for failing to object, Matias has not demonstrated prejudice.  Matias has not shown how being provided the thirty days' notice would have resulted in a different outcome.  The evidence at issue was the same evidence known to Matias that was to

16

be presented at trial to prove the charges against him.  He has not described how he could have opposed the evidence showing propensity any differently from how he opposed the same evidence that was used to prove the charges.  Matias offered no defense other than cross-examining the witnesses to undermine their credibility and argue that the prosecution failed to meet its burden.  He has not shown that the denial of this claim was unreasonable.

## VI.        ADMISSION OF EVIDENCE

Matias argues that his due process rights were violated due to the admission of the following evidence: (1) the preliminary hearing testimony of the victims; (2) the statements concerning A.'s demeanor at the preliminary hearing; and (3) the statements regarding the victims' competency.

### Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031.  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

#### i.        Preliminary Hearing Testimony

After a hearing, the trial court granted the prosecution's motion to admit the preliminary hearing testimony of the victims at trial pursuant to California Evidence Code section 1360.

United States District Court
Northern District of California

Matias argues that the trial court erred in finding that A.s and L.'s preliminary hearing testimony was sufficiently reliable to be admitted.  The California Court of Appeal denied the claim:

> In determining reliability, we consider all relevant factors including (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate.  (*People v. Eccleston*, *supra*, 89 Cal. App. 4th at p. 445; *People v. Brodit*, *supra*, 61 Cal. App. 4th at pp. 1329-1330, *citing In re Cindy L.*, *supra*, 17 Cal. 4th at pp. 29-30.)  Moreover, "the child's ability to understand the duty to tell the truth and to distinguish between truth and falsity is also a factor in determining the reliability of his or her extrajudicial statements."  (*In re Cindy L.*, *supra*, 17 Cal. 4th at p. 30.)

> A.'s and L.'s preliminary hearing testimony was not spontaneous.  However, their testimony that defendant touched their private parts numerous times, they were scared of him, they told him to stop, and he would not stop was consistently repeated either to the officers who interviewed them or at trial or both.  Concerning A.'s and L.'s mental state at the preliminary hearing, the record does not suggest that they were in a state that might undermine the reliability of their testimony.  Although the transcript strongly suggests that they were at times hesitant or reluctant to talk about the particulars of the abuse, such hesitance or reluctance does not reasonably imply that the testimony they gave was unreliable.  Next, we do not find that A. nor L. used words that a child would not be expected to know in describing defendant's conduct.  On the contrary, they used their own age-appropriate words to describe their body parts.  Concerning motive, the record does not reveal that at the preliminary hearing, the girls had a motive to fabricate the molestation.  Rather, both girls said that defendant's touching scared them, and A. said that defendant was mean to her in that he touched her.  Finally, at the preliminary hearing, both girls were asked whether they understood the difference between what is true and what is false, and the court was satisfied that they did and found them competent to testify.

> Given the record, we do not find that as a matter of law, the preliminary hearing testimony was too unreliable to be admissible.  Instead, we agree with the trial court that on balance, the girls' basic testimony that defendant touched their private parts on a number of occasions, that they told him not to, that he warned them not to tell their mother, and that he would not stop was sufficiently reliable to render their preliminary hearing testimony admissible under section 1360.

> We acknowledge, as defendant points out, that there were inconsistencies and contradictions between what A. and L. said at the preliminary hearing and what they told the officers who interviewed them, what they later told Ms. Ritter, and what they said at trial concerning the number of times defendant touched them, whether he directly touched their skin, whether he penetrated them, whether he touched their breasts, whether and where he kissed them, and whether they saw his penis.

1

2    On those particular issues, the preliminary hearing testimony
      provided the defense with evidence that could be used to impeach
3    A.'s and L.'s other statements.  However, given A.'s and L.'s ages
      and the fact that they were confronted with the formality of
      testifying in court with adults questioning them, we do not find that
4    the inconsistencies and contradictions on those details undermined
      the reliability of their preliminary hearing testimony that defendant
5    touched their private parts more than once, allegations that they
      consistently repeated.

6    *Matias*, 2012 WL 1490489, at *7-8.

7          The state courts found that the evidence was properly admitted under state law and Matias

8    cannot challenge the state courts' interpretation of state law in his federal habeas petition.

9    Moreover, there is no Supreme Court authority finding that habeas relief can be provided due to

10   the admission of irrelevant or overtly prejudicial evidence.  *See Holley.*  The state court decision

11   denying this claim could not have been an unreasonable application of Supreme Court authority.

12   Matias has not shown that the admission of the preliminary hearing testimony was a violation of

13   such magnitude that the result was a denial of the fundamentally fair trial guaranteed by due

14   process.  This claim is denied.

15          **ii.      A's Demeanor at Preliminary Hearing**

16         The California Court of Appeal set forth the relevant background and denied this claim.

17

18    At one point when A. was testifying, she apparently became
      emotional.  The prosecutor and court asked if she was okay or
19   wanted to take a break.  After a break, the prosecutor asked if she
      was feeling sad.  She said she was but could not say why.  At
20   another point, the prosecutor asked whether defendant had touched
      her private parts on her skin and whether her underwear was on or
21   off.  A. did not respond.  The prosecutor noted that she had started to
      cry.  After a pause in the proceedings, the court asked A. if she
22   wanted her mother to sit next to her while she testified.  A. said she
      did.  The court then explained that her mother could only sit there;
23   she could not talk to A. or answer questions.  Only A. could answer
      the questions.

24    Defendant argues that the statements describing A.'s demeanor were
25   not admissible under section 1360 because A.'s demeanor was not
      nonverbal conduct that A. intended as a substitute for an oral or
26   written expression about defendant's abuse.  (*See* Evid. Code, § 225
      [defining "'[s]tatement'"].)

27    We agree that the statements by the prosecutor and court were not
28   admissible under section 1360.  However, we find that their
      admission was harmless.  The comments about A.'s demeanor were

19

brief. And although the evidence may have evoked sympathy for A. and the difficulty she apparently had testifying at the preliminary hearing, her demeanor did not have a tendency to make her preliminary hearing testimony or statements to the officers or Ms. Ritter more credible or convincing; nor did evidence of her demeanor tend to make her a more credible witness at trial. The testimony at the preliminary hearing did not corroborate the statements A. provided at other times about defendant's use of force that support the convictions for forcible lewd conduct. Moreover, the jury was able to see A. testify at trial and assess her credibility at that time. Last we consider defendant's argument that the jury would have wanted to punish defendant for putting the girls through the trauma of testifying to be at best speculation.

Under the circumstances, we do not find it reasonably probable defendant would have obtained a more favorable outcome had the jury not heard the brief comments about A.'s demeanor at the preliminary hearing. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Matias*, 2012 WL 1490489, at *8-9

The state court found that it was an error to admit the statements describing A.'s demeanor, but that the error was harmless. If a state court finds an error harmless, that determination is reviewed under the deferential AEDPA standard. This means that relief is not available for the error unless the state court's "harmlessness determination itself was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). A federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). And if the federal court determines that the state court's harmless error analysis was objectively unreasonable, it also must find that the error was prejudicial under *Brecht* before it can grant relief. *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace *Brecht*).

Here, the state court decision that the error was harmless was not so lacking in justification that it could be perceived as a well-understood error. The state court noted that the improperly admitted statements concerning A.'s demeanor were brief and did not have a tendency to make her appear more credible or convincing as a result. This determination is not unreasonable, and, because A. testified at trial, the jury was able to assess her credibility. Matias has not shown that he is entitled to relief.

### iii.    A.'s and L.'s Competence

At the preliminary hearing, due to the young age of the victims, the trial court questioned A. and L. about whether they knew the difference between telling the truth and lying and whether they promised to tell the truth.  RT at 302-07, 357-61.  Based on their answers the trial court found that they were competent to testify.  *Id*.  Matias argues that the admission at trial of these preliminary exchanges violated his rights because the jury could have understood the comments to be judicial determinations that A. and L. were telling the truth.  *Matias*, 2012 WL 1490489, at *9.

The following exchange occurred at the preliminary hearing with A.:

> The Court:     Now, do you know the difference between telling the truth and telling a lie?
>
> A.:             No.
>
> The Court:     All right.  If I told you that this thing in my hand was red, [would] that be the truth, or would it be a lie?
>
> A.:             A lie.
>
> The Court:     Why?
>
> A.:             Because it's actually blue.
>
> The Court:     It's blue.  So when you lie, you say something that isn't so.  Do you understand that?
>
> A.:             Uh-huh
>
> The Court:     You need to answer out loud.
>
> A.:             Yes.
>
> The Court:     Okay.   And had anyone taught you that you're supposed to say what really is and not make things up?
>
> A.:             Yes.
>
> The Court:     So when you're in court - - this is a courtroom.  When you're in a court, you have to promise me, the judge, that you will tell the truth when you answer questions.  Will do you that?
>
> A.:             Yes.

RT at 306-07.  The trial court asked similar questions to L., who also answered that she would not lie or pretend.  RT at 359-61.  The California Court of Appeal denied Matias' claim:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9

We conclude that any error in admitting these exchanges was harmless.  They were extremely brief.  And because they only involved whether A. and L. understood the difference between the truth and a lie and reflected their promise to tell the truth, we considerate it inconceivable that any juror understood them as a finding by the court that everything the girls said was the truth.  We further note that the girls' preliminary hearing testimony did not corroborate the statements they made concerning defendant's forcible conduct.  Moreover, the jurors had ample evidence and direct observation of A. and L. to determine the credibility of all of their incriminating statements and testimony; and, despite the magistrate's determination of competence to testify, the inconsistencies and contradictions in what the two girls said at various times provided the defense with fodder to impeach both girls' credibility.  Again, it is not reasonably probable defendant would have obtained a more favorable outcome had the jurors not heard the competency exchanges.  (*People v. Watson, supra*, 46 Cal. 2d at p. 836.)  FN12

10
11
12
13
14
15
16

FN12. We reject defendant's claim that error in admitting evidence of A.'s demeanor and A.'s and L.'s competency implicated his federal constitutional rights.  "We do not reverse a judgment for erroneous admission of evidence unless 'the admitted evidence should have been excluded on the ground stated and . . . the error or errors complained of resulted in a miscarriage of justice.'  (Evid.Code, § 353, subd. (b); *see also* [citation]; *People v. Watson* (1956) 46 Cal. 2d 818, 836 [error is harmless under our state constitutional standard unless it is 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'].)"  (*People v. Earp* (1999) 20 Cal. 4th 826, 878.)

17
18

*Matias*, 2012 WL 1490489, at *9.

19
20
21
22
23
24
25

A review of the record supports the California Court of Appeal's finding that the jury would not have understood the statements to mean that the trial court had found the victims were telling the truth.  The conversation between the victims and the judge was simply to establish that these young witnesses understood the difference between a lie and the truth and the importance of speaking the truth while in court.  The state court's finding was not unreasonable.  Nor has Matias shown that the admission of these brief statements was so improper that the result was a denial of his right to a fundamentally fair trial guaranteed by due process.  This claim is denied.

26
27
28

22

VII.          **CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME EVIDENCE**

Matias contends that the trial court erred by admitting expert testimony to describe CSAAS[3] and instructing the jury that it could use this evidence in assessing witness believability.

**Legal Standard**

The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101.  The Ninth Circuit has held that CSAAS testimony is admissible in federal child sexual abuse trials, where the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth.  *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003); *United States v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) (per curiam).  In *Brodit*, the Ninth Circuit recognized that CSAAS evidence "describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse."  350 F.3d at 991.  The court observed that inconsistencies in a child's account of abuse, including delays in reporting, do not necessarily mean the child is lying.  *Id*.  Ultimately, the *Brodit* majority approved of the California Court of Appeal's holding in *People v. Patino*, 26 Cal. App. 4th 1737 (1994), that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's due process rights.  *Brodit*, 350 F.3d at 991.

The Ninth Circuit has also rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony.  *See Bighead*, 128 F.3d at 1330-31.  In *Bighead*, the Ninth Circuit held that there was no abuse of discretion in the district court's admission of expert testimony about certain characteristics of child sexual abuse victims in the prosecution's rebuttal.  *See id*.  The court noted that the expert did not testify about the facts of the particular case, or about the particular victim,

---

[3] CSAAS describes the manner in which a child discloses abuse or behaves when being abused and how it can conflict with common, preconceived notions of how a child might or should react. CSAAS describes a variety of factors that may exist when a disclosure is made.  It can provide background information and explains that there is no single thing to look for in determining whether a child is being or has been abused.  However, CSAAS is not a science or a measure of whether a child is telling the truth about being abused.  *Matias*, 2012 WL 1490489, at *3.

whom she had never examined. *Id.* Rather, the testimony was limited to evidence of "delayed disclosure" and "script memory," which were indicative of abused children as a class of individuals. *Id.* Further, in addressing a relevancy challenge, the court stated, "[the expert's] testimony had significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony." *Id.* The court affirmed the defendant's conviction, holding that the district court did not abuse its discretion in permitting the expert to testify. *Id.* The court also noted that, "[r]egardless, the jury was free to determine whether the victim delayed disclosure or simply fabricated the incidents." *Id.* at 1331.

**Discussion**

The California Court of Appeal rejected Matias' claims regarding the admission of the CSAAS evidence and the related jury instruction:

> In *People v. Perez* (2010) 182 Cal. App. 4th 231, this court rejected a similar challenge to the admissibility of CSAAS evidence. We found "no reason to depart from recent precedent, to wit: 'CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident-e.g., a delay in reporting-is inconsistent with his or her testimony claiming molestation. [Citations.]"' [Citations.] Moreover, it appears that our Supreme Court reached the same conclusion in *People v. Brown* (2004) 33 Cal. 4th 892, 906, in which case we are bound by its reasoning (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal. 2d 450, 455). Here, we reiterate, the victim's testimony on direct examination was inconsistent with her prior statements in a way that tended to exculpate defendant. "'"Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]"' [Citation.]" (*People v. Perez, supra*, 182 Cal. App. 4th at p. 245.)
>
> . . .
>
> Defendant contends the court's standard instruction on CSAAS testimony-CALCRIM No. 1193-is flawed, and therefore the court erred in giving it.

United States District Court
Northern District of California

In accordance with CALCRIM No. 1193, the court instructed the jury as follows: "You have heard testimony from Carl Lewis regarding [CSAAS]. Carl Lewis' testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [A.'s or L.'s] conduct was not inconsistent with the conduct of someone who has been molested [and] in evaluating the believability of her testimony." (*See* CALCRIM No. 1193.)

Defendant cites *People v. Bowker*, *supra*, 203 Cal. App. 3d 385 for the proposition that when CSAAS testimony is admitted, the court must instruct the jury that it "is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id*. at p. 394; *see People v. Brown*, *supra*, 33 Cal. 4th at pp. 905-906 [recognizing admissibility of expert testimony to dispel common misconceptions about how victims behave but not to prove alleged victim had actually been molested].) Defendant argues that CALCRIM No. 1193 is internally inconsistent because it informs the jury that the testimony may only be used to decide whether the victim's testimony is consistent with that of someone who has been molested; and it then informs the jury that the testimony may be used to evaluate the victim's "believability." According to defendant, however, permitting use of the evidence to evaluate "believability" is the same as using the evidence to determine whether the victim's claim of molestation is true, in violation of *Bowker*.

The court's instruction expressly told the jury not to use the expert's testimony as evidence that defendant molested A. or L. ("testimony . . . is not evidence that the defendant committed any of the crimes charged"); and it advised the jury that it could consider the CSAAS evidence only for the limited purpose of evaluating whether A.'s and L.'s behavior was inconsistent with having been molested ("You may consider this evidence only in deciding whether or not [A.'s or L.'s] conduct was not inconsistent with the conduct of someone who has been molested"). However, the instruction also permitted the jury to consider the evidence in evaluating their credibility.

As noted, CSAAS evidence is offered to disabuse a jury of misconceptions it might hold about how a child reacts to a molestation. (*People v. McAlpin* (1991) 53 Cal. 3d 1289, 1300-1301.) However, when the victim's credibility is attacked, "[t]he [CSAAS] testimony is pertinent and admissible." (*People v. Patino*, *supra*, 26 Cal. App. 4th at p. 1745; *cf. People v. Brown*, *supra*, 33 Cal. 4th at p. 906 [expert testimony on battered woman's syndrome admissible to rehabilitate credibility of victim].)

Here, the girls' credibility was clearly in dispute and an important question for the jury to determine. Simply put, the CSAAS testimony was relevant and could help the jurors understand the inconsistencies and contradictions in the girls' various versions of defendant conduct and determine whether they undermined the girls' credibility and rendered all of their allegations unbelievable. Although evaluating their credibility is a step in determining what happened to the girls, we disagree with defendant's view that the instruction effectively, albeit implicitly, told jurors the testimony

could be used to determine whether defendant molested them.

In analyzing a claim of inadequate instructions, we review the instruction in light of the evidence and the arguments of counsel to determine whether there is a reasonable likelihood that the jury understood the instructions in the manner proposed by the defendant. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *Boyde v. California* (1990) 494 U.S. 370, 378-381; *People v. Holt* (1997) 15 Cal. 4th 619, 677; *People v. Clair* (1992) 2 Cal. 4th 629, 663; *People v. Dieguez* (2001) 89 Cal. App. 4th 266, 276.)

Here, we do not find a reasonable likelihood that jurors would (or did) think they could use the CSAAS testimony to determine whether defendant molested A. or L. Not only did the instruction explicitly limit the purposes of the testimony and inform jurors that it was not evidence that he committed any of the charged crimes, but also the prosecutor did not suggest that the testimony could be used to determine whether defendant committed any offense. On the contrary, the prosecutor stated that Carl Lewis was "not [t]here to tell you who to believe and who not to believe" and his testimony was offered because it "dispels myths and preconceived ideas about child sexual assault. If it's helpful to you, great. If it's not helpful to you, ignore it." Moreover, defense counsel emphasized Carl Lewis's testimony that CSAAS was not "diagnostic."

*Matias*, 2012 WL 1490489, at * 10, 17-18 (footnotes omitted).

Here, the CSAAS expert only testified about the general nature of the syndrome. RT at 271-90. He explained that he did not interview any of the witnesses, investigate this case, or know any specific facts about the case. RT at 267. The trial court also repeatedly instructed the jury to consider the evidence only in deciding whether or not the alleged victims' conduct was not inconsistent with the conduct of someone who had been molested and in evaluating the believability of their testimony. RT at 256-57; 490; CT at 300.

Matias cites to no Supreme Court authority to support his claim that the trial court's decision to admit the CSAAS evidence violated his right to due process, and the evidence complied with the limits set forth by the Ninth Circuit in *Brodit*. Thus the admission of the evidence did not violate Matias' due process rights. *See, e.g.*, *Manson v. Grounds*, No. 12–6043 CRB (PR), 2014 WL 688614, at *7-8 (N.D. Cal. Feb. 20, 2014) (rejecting petitioner's challenge to the admission of CSAAS evidence as foreclosed by *Brodit*).

Matias has also not shown that the trial court erred in instructing the jury with CALCRIM No. 1193. As noted by the California Court of Appeal, the jury instruction meets the requirements under state law that the admission of CSAAS evidence be accompanied by a limiting instruction

1    informing the jury that the expert's testimony should not be used to determine whether the

2    victim's molestation claim is true, but only to decide whether the victim's reactions are consistent

3    with having been molested.  *See Patino*, 26 Cal. App. 4th at 1745-46.  This limiting instruction

4    also ensured that the jury considered the CSAAS evidence as required by *Brodit*, 350 F.3d at 991,

5    and would not use the evidence to bolster the credibility of the alleged victims.  Matias has not

6    shown that it was an error to issue this jury instruction or that it had a substantial or injurious

7    effect on the verdict.  Rather, the jury instruction protected Matias' rights by properly limiting the

8    jury's use of the CSAAS evidence.  He is not entitled to habeas relief for this claim.

9    **VIII.     SUFFICIENCY OF THE EVIDENCE**

10    Matias argues that there was insufficient evidence to support the two counts of aggravated

11    lewd conduct against A.

12    **Background**

13    Matias was found guilty of two counts of lewd or lascivious act on A. by force, duress,

14    violence, menace or fear, in violation of California Penal Code section 288(b)(1).  The relevant

15    portions of section 288 state:

16

17    (a) Except as provided in subdivision (i), any person who willfully
and lewdly commits any lewd or lascivious act, including any of the
acts constituting other crimes provided for in Part 1, upon or with

18    the body, or any part or member thereof, of a child who is under the
age of 14 years, with the intent of arousing, appealing to, or

19    gratifying the lust, passions, or sexual desires of that person or the
child, is guilty of a felony and shall be punished by imprisonment in

20    the state prison for three, six, or eight years.

21

22    (b)(1) Any person who commits an act described in subdivision (a)
by use of force, violence, duress, menace, or fear of immediate and

23    unlawful bodily injury on the victim or another person, is guilty of a
felony and shall be punished by imprisonment in the state prison for

24    5, 8, or 10 years.

Cal. Penal section 288(a), (b)(1).

25

26    Matias argues there was insufficient evidence to support the convictions on theories that he

27    used force or that he used duress.  To establish lewd conduct by force it must be proven that the

28    defendant used force "substantially different from or substantially greater than that necessary to

United States District Court
Northern District of California

27

1    accomplish the lewd act itself." *Matias*, 2012 WL 1490489, at *4. To establish lewd conduct by

2    duress, it must be shown that "a direct or implied threat of force, violence, danger, hardship or

3    retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an

4    act which otherwise would not have been performed or, (2) acquiesce in an act to which one

5    otherwise would not have submitted." *Id*. at *6.

6          **Legal Standard**

7          The Due Process Clause "protects the accused against conviction except upon proof

8    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

9    charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the

10   evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

11   rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

12   *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

13   relief, *see id*. at 324.

14         The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas

15   proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

16   that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the

17   deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the

18   evidence was insufficient to support petitioner's conviction). A federal court reviewing

19   collaterally a state court conviction does not determine whether it is satisfied that the evidence

20   established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

21   The federal court "determines only whether, 'after viewing the evidence in the light most

22   favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

23   the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at

24   319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt

25   has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

26         **Discussion**

27         The California Court of Appeal discussed the relevant state law regarding force and duress

28   to establish aggravated lewd conduct and denied this claim:

United States District Court
Northern District of California

28

In *People v. Alvarez* (2009) 178 Cal. App. 4th 999, the court explained that "a 'defendant may fondle a child's genitals without having to grab the child by the arm and hold the crying victim in order to accomplish the act. Likewise, an assailant may achieve oral copulation without having to grab the victim's head to prevent the victim from resisting.' [Citation.] Lewd conduct of this sort is punishable in and of itself. [Citation.] Therefore, it stands to reason that the force requirement will be deemed satisfied when the defendant uses any force that is 'different from and in excess of the type of force which is used in accomplishing similar lewd acts....' [Citation.] [¶] According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves. [Citations.]" (*Id*. at p. 1005; *see*, *e.g.*, *People v. Bolander* (1994) 23 Cal. App. 4th 155, 160-161 [pulling victim's pants down, bending him over, and pulling him toward defendant constituted forcible lewd conduct]; *People v. Neel* (1993) 19 Cal. App. 4th 1784, 1790 [pushing the victim's head down on defendant's penis, grabbing her wrist, and placing her hand on his penis to masturbate him constituted forcible lewd conduct]; *People v. Babcock* (1993) 14 Cal. App. 4th 383, [grabbing victim's hand and making him touch defendant's genitals constituted sufficient force].)

For example, in *People v. Gilbert* (1992) 5 Cal. App. 4th 1372, the victim testified that the perpetrator's forearm was over her mouth rendering her unable to cry out during the sexual conduct, and when she attempted to move, the perpetrator pushed her back. In finding sufficient evidence of force, the court explained, "It was not necessary to accomplishment of the described sexual acts that [the victim] be prevented from moving or from crying out. [The perpetrator's] described acts therefore exceeded any force necessary to the acts." (*Id*. at p. 1381; *People v. Cardenas* (1994) 21 Cal. App. 4th 927, 940 [force found where victim held and pillow used to stifle her screams].)

During the recorded interview with Officer Jaime, A. described how once, when she was alone with defendant, he started kissing her. She told him to stop and said she did not want to do it anymore. But he kept doing it, and when she tried to call out to her aunt, he put his hand over her to mouth stifle her attempt.

Defendant argues that putting his hand over A.'s mouth to prevent her from calling out cannot satisfy the force requirement because that act of force took place after he stopped kissing her and thus was used not to accomplish the lewd conduct but to facilitate his escape.

In the interview with Officer Jaime, A. said, "Then I said-then I said, I don't want to do it anymore. And then . . . then I told him . . . mm, *then he said, I don't want to stop but then he keep doing it, and then, and I call-and I was going to call my auntie but then he, then he . . . went like that to me*." (Italics added.) Officer Jaime responded, "He went like that to you, and so right now you're putting your, your hand over your mouth?" A. said, "He, he, he put his hand in my mouth."

United States District Court
Northern District of California

A.'s statement does not conclusively or necessarily establish that defendant applied force that was separate and/or different from his lewd conduct only after that conduct-i.e., the kissing. Rather, it reasonably reveals that A. asked defendant to stop kissing her, he refused and kept kissing her, and while doing so, he covered her mouth to prevent her from calling out to her aunt. Moreover, at the preliminary hearing, A. testified that defendant kissed her on the neck and that she told J.; and J. testified at trial that A. told her that defendant had kissed her on the neck. Thus, defendant did not have to stop kissing A. when he covered her mouth and prevent her from calling out.

Given the evidence, a jury reasonably could find that in physically stifling A. with his hand to prevent her from calling out, defendant used force substantially different from and in excess of that required to kiss her. This is especially so given the age and, we assume, size disparity between them, which would have made it extremely difficult, if not impossible, A. to escape his grasp had she tried to do so.

The record also reveals that A. told Officer Jaime that once defendant pulled her underwear aside and then penetrated and squished her "pee-pee," which caused bleeding.

Pulling A.'s underwear aside involved the use of force. Although it probably did not require much force, aggravated lewd conduct need only involve force that is substantially different from that needed to accomplish the lewd act. Here, a jury could find that the act of pulling A.'s underwear aside was substantially different from the act of penetrating and squishing her "pee-pee." Moreover, it was unnecessary for defendant to pull A.'s underwear aside to commit the lewd act. Defendant could have simply slid his hand beneath her underwear or penetrated and squished her through her underwear. Alternatively, he could have had A. move or remove her underwear. Thus, that defendant pulled A.'s underwear aside instead of ripping her clothing off does not preclude a finding of force. Nor does the fact that A. apparently did not resist when he pulled her underwear aside. Although such resistance would further support a finding of force beyond that necessary to commit the lewd act (*see, e.g., People v. Bolander, supra,* 23 Cal. App. 4th 155 [defendant overcame the victim's resistance to having his pants pulled down and being bent over and pulled toward defendant] ), the California Supreme Court in *Soto* made it clear that aggravated lewd conduct does not require a finding of force against the victim's will or resistance. (*Soto, supra,* 51 Cal. 4th at p. 248.)

. . .

This court has recognized that "'"[d]uress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . . "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.' [Citation.]" (*People v. Espinoza* (2002) 95 Cal. App. 4th

1287, 1319-1320; *People v. Schulz*, *supra*, 2 Cal. App. 4th 999, 1005.)  "Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*People v. Cochran* (2002) 103 Cal. App. 4th 8, 14.)  "A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent. . . .  [S]uch a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults." (*Id*. at p. 15.)

We conclude that the totality of the circumstances surrounding defendant's ongoing molestation of A. and L. supports findings that defendant secured the girls' compliance against their will through duress.

First, although defendant was not a parent or relative, he would naturally enjoy the inherent respect and authority that six-year-old children would commonly, if not instinctively, afford adults, especially one who lived with them. (*See People v. Pitmon* (1985) 170 Cal. App. 3d 38, 51.) Moreover, for six-years-old girls, an unrelated, adult man who approached them and physically imposed himself would naturally be intimidating and foster a sense of physical vulnerability and defenselessness. (*See People v. Cochran*, supra, 103 Cal. App. 4th 13-14 [age and size disparity].)

Next, we note that both girls said that after defendant started molesting them, they were afraid or scared of him.  They would tell him to stop touching them, but he refused, and he continued to exploit them over a period of time.  Moreover, there was evidence that in some instances, he physically grabbed L.; his conduct inflamed A. vagina and caused her to bleed. (*See People v. Schulz*, *supra*, (1992) 2 Cal. App. 4th at p. 1005 [continuous exploitation]; *People v. Senior*, *supra*, 3 Cal. App. 4th at p. 775 [use of physical control].)  Defendant's ongoing molestation and occasional use of force despite the girls' protests could only have accentuated the girls' sense of powerlessness and enhanced the psychologically coercive nature of defendant status, authority, size and age.

Finally, we note that from the beginning, defendant warned A. not to tell her mother, and L. not to tell anyone.  A "simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition." (*People v. Senior*, *supra* 3 Cal. App. 4th at p. 775.)  It is true that defendant did not couple his warnings with an express threat that they would suffer some bad consequence-i.e., bodily harm, jeopardy to someone else, family disruption. (*See People v. Espinoza*, *supra*, 95 Cal. App. 4th at pp. 1318-1321 [no evidence that lewd acts were accompanied by threat that impelled compliance].)  Nevertheless, we believe that given the disparity in age and size), the girls' generalized fear of defendant, his ongoing molestation and occasional use of force, and his refusal to heed their protest, a jury reasonably could find that defendant's express warnings implicitly conveyed a "don't tell or

United States District Court
Northern District of California

1    else" type threat of retribution or negative consequences, and that
     these circumstances combined to overcame the girls' resistance,
2    coerce their acquiescence, and thereby enable defendant to continue
     molesting them.  In our view, when an adult male molests a child
3    despite her protests and repeatedly warns her not to tell anyone, the
     naturally intimidating circumstances and the warnings can be
4    enough to trigger a child's fearful imagination of some negative
     consequence and coerce acquiescence.

5    In sum, we conclude that there is substantial evidence to support
     defendant's convictions on theories that he used force and/or duress
6    to commit the lewd acts.

7    *Matias*, 2012 WL 1490489, at * 4-7 (footnote omitted).

8         Matias has not shown that the state court was objectively unreasonable in finding sufficient

9    evidence to support the convictions in light of the high bar for this type of claim.  The California

10   Court of Appeal identified the evidence presented at trial with respect to A. and cited to applicable

11   state law that found this type of evidence sufficient to demonstrate force and duress.  Viewing this

12   evidence in the light most favorable to the prosecution any rational trier of facts could have found

13   the essential elements of the charged crimes beyond a reasonable doubt.  A review of the record

14   supports the findings of the state court and the evidence presented regarding A. was sufficient for

15   a finding of force and duress to support the convictions.  Matias has failed to meet his burden in

16   showing that the state court's decision was an unreasonable application of Supreme Court

17   authority.  This claim is denied.

18   **IX.     DURESS JURY INSTRUCTION**

19        Matias contends that the trial court erred in instructing the jury on the theory of aggravated

20   lewd conduct by duress.  He argues that instructing the jury on this theory was an error because it

21   was not supported by the evidence.

22        **Legal Standard**

23        To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

24   the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

25   process.  *See Estelle*, 502 U.S. at 72.  A conviction based on a general verdict is subject to

26   challenge if the jury was instructed on alternative theories of guilt and may have relied on an

27   invalid one.  *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam).  Such instructional error is

28   not structural; rather, a reviewing court must apply the harmless-error analysis set forth in *Brecht*

1    and determine whether the error had a "substantial and injurious effect or influence in determining

2    the jury's verdict." *Id.* (reversing Ninth Circuit's application of structural error analysis and

3    remanding for application of *Brecht*)

4            **Discussion**

5            The state court held that because it found that there was sufficient evidence to support the

6    conviction based on duress, there was no merit to Matias' claim of instructional error.  *Matias*,

7    2012 WL 1490489, at *16.  The California Court of Appeal still looked to the merits of the claim

8    and denied it:

10           However, even if we assume that it was error to instruct on duress,
             the error would not compel reversal.

11           Where the prosecution presents its case on alternative theories, one
12           of which is legally incorrect, and the reviewing court cannot
             determine from the record on which theory the ensuing general
13           verdict of guilt rested, the conviction cannot stand.  (*People v.
             Guiton* (1993) 4 Cal. 4th 1116, 1129.)  However, this standard of
14           review does not apply here because duress did not represent a
             legally incorrect theory of aggravated lewd conduct.  Rather, where,
15           as here, the court permits a jury to consider a factual theory for
             which there is insufficient evidence, that is, where the jury is
16           presented with two alternative theories, one supported by the
             evidence but the other not supported, reversal is required only if the
17           record affirmatively shows a reasonable probability that the jury
             relied on the factually unsupported theory.  (*People v. Guiton*,
18           *supra*, 4 Cal. 4th 1116, 1129; *People v. Vargas* (2001) 91 Cal. App.
             4th 506, 564; *see People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

19           Here, the court defined "duress" as "a direct or implied threat of
20           force, violence, danger, hardship, or retribution that causes a
             reasonable person to do or submit to something the he or she would
21           not otherwise do or submit to."  The court repeatedly instructed the
             jury that the prosecution had the burden to prove every element of
22           the charged offenses beyond a reasonable doubt.  The court also
             instructed the jury that some of its instructions may not apply,
23           depending on its findings, and therefore, jurors should not assume
             that because a particular instruction was given, the court was
24           suggesting anything about the facts.  Finally, there was sufficient
             evidence to support convictions based on defendant's use of force.

25           We presume that jurors can understand the court's instruction and
26           thus are "fully equipped to detect" a factually inadequate theory.
             (*People v. Guiton*, *supra*, 4 Cal. 4th at p. 1129.)  Thus, even
27           assuming the duress instruction had no application here, it is not
             reasonably probable the jury would have relied on a factually
28           unsupported theory or that defendant would have obtained a more
             favorable result absent the "duress" instruction; rather, we may

assume that the jury would have based (and did base) its verdict on a factually supported theory.  (*People v. Lucas* (1997) 55 Cal. App. 4th 721, 733-734.) FN20

> FN20. We reject defendant's claim that the alleged error implicated defendant's federal constitutional rights.  (*See People v. Guiton*, *supra*, 4 Cal.4th at p. 1129 [*Watson* applies].)

*Matias*, 2012 WL 1490489, at *16-17.

Because there was sufficient evidence to support the conviction on a theory of duress, Matias is not entitled to relief on his jury instruction claim.  Even if there was not sufficient evidence to support the duress theory, Matias is still not entitled to habeas relief because he has not shown that the state court's denial of this claim was unreasonable.  The Supreme Court held in *Pulido* that a conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.  555 U.S. at 58.  Matias has not shown that the duress theory was invalid or legally incorrect and, even if it was invalid, there is no evidence that the jury relied on it in reaching a verdict.  The jury was properly instructed on the force theory for aggravated lewd conduct and there was sufficient evidence to support the force theory for both victims.  CT at 206-16, 232-33, 245-46; RT at 116-18, 135-37, 162-64, 374.  Finally, even if there was instructional error, the *Brecht* harmless-error analysis applies, and Matias has not shown the alleged error had a substantial and injurious effect or influence in determining the jury's verdict.[4]

## X.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

---

[4] To the extent Matias has also presented a cumulative error claim to the Court, any claim is denied.  The California Court of Appeal denied this claim, *Matias*, 2012 WL 1490489, at *18 n.23, and that denial was not unreasonable.  The Court has not found multiple errors that cumulatively would allow for reversal.

United States District Court
Northern District of California

certificate must indicate which issues satisfy this standard. *Id*. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

     Here, petitioner has made no showing warranting a certificate and so none is granted.

**CONCLUSION**

     For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

     **IT IS SO ORDERED.**

Dated: October 13, 2015

 

 

_____
JAMES DONATO
United States District Judge

1
2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3
4
5
6
7
8

PABLO B. MATIAS,

           Plaintiff,

     v.

CONNIE GIPSON,

           Defendant.

Case No.  14-cv-00526-JD

**CERTIFICATE OF SERVICE**

9
10
11

     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

12
13
14
15
16

     That on October 13, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

17
18
19

Pablo B. Matias ID: AD5597
H.D.S.P
P.O. Box 3030
Susanville, CA 96127

20
21

Dated: October 13, 2015

22
23
24

Susan Y. Soong
Clerk, United States District Court

25
26
27

By: *Lisa R. Clark*

LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO

28

36